different things," and computed the price from the average of all the purchases entered on the books for the entire period of the copartnership down to the execution of the bill of sale. The appellant claims that there was other stock on hand in large quantities, not shown by the books, and that the price assumed by the expert was not the current market price at the time of the execution of the bill of sale. He had prepared an estimate from personal examination on November 10 and 11, 1889, which the court excluded under respondent's objection and appellant's exception. On objection interposed by the respondent, the court precluded appellant from testifying as to the market price upon which the value of the stock on hand should be figured, upon the ground that the testimony of the witness should have been exhausted when he was first upon the stand. From the subsequent admission during appellant's case of the general evidence relating to matters concerning which the court had excluded special evidence, it may be that the court intended to change its ruling, and permit appellant to establish the solvency of the firm; but the record contains no other evidence of a change of intention on the part of the court in that regard. Perhaps the appellant should have again offered specific evidence of the assets and liabilities. We think, however, that it was important evidence, and would have materially aided in solving this important question of fact. Whatever the condition of the firm was with reference to solvency or insolvency, the appellant undoubtedly possessed accurate knowledge on the subject. If the firm was insolvent, then, of course, it is not improbable that he would be willing to execute a bill of sale of his interest; but, if the firm were solvent, so that he had a substantial interest in the business, nothing is shown as an inducement for his executing the bill of sale.

It follows that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event.

O'BRIEN and HATCH, JJ., concur. PATTERSON and McLAUGHLIN, JJ., concur in result.

○

(85 App. Div. 187.)

## McAULIFFE v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, Third Department. June 30, 1903.)

1. RAILROADS—CROSSING ACCIDENT—FAILURE TO LOOK—OBSERVANCE OF DUE CARE.

The failure of the driver of a team approaching a railroad crossing along a parallel roadway to look again to the rear for an approaching train, after having looked once when 200 feet from the crossing, is not the observation of that care which it is his duty to exercise.

2. SAME—PRESUMPTION.

Though one killed at a railroad crossing is shown by the proof to have had the approach of a train in mind, the presumption that he exercised due care in looking does not arise where, from the natural features of the locality, it is apparent that, had he looked, he could have avoided the accident.

**3. SAME—BURDEN OF PROOF.**

    In an action for the negligent killing of an intestate at a railroad cross-
ing, plaintiff, to recover, must show, either by direct evidence or fairly
deducible inference, that decedent was free from contributory negligence;
and where the circumstances point as much to negligence as to its ab-
sence, or point in neither direction, a nonsuit should be ordered.

    Appeal from Trial Term, Ulster County.

    Action by ·Catherine McAuliffe, as administratrix of the goods,
etc., of Cornelius McAuliffe, deceased, against the New York Cen-
tral & Hudson River Railroad Company.    From a judgment for
plaintiff, and from an order denying a motion for a new trial on the
minutes, defendant appeals.    Reversed.

    Argued before PARKER, P. J., and SMITH, CHASE, and
HOUGHTON, JJ.

    Amos Van Etten, for appellant.

    John G. Van Etten (Howard Chipp, of counsel), for respondent.

    HOUGHTON, J.   The plaintiff's intestate was killed at a grade
crossing on the outskirts of the city of Kingston.  He was a team-
ster, and was driving a four-horse team, attached to a heavy, empty.
stone wagon, returning from the delivery of a load, in company with
another team, which preceded him.   The accident occurred about 6
o'clock in the evening, in December, 1900.   It was dark and cold,
with some wind, but not storming.   The plaintiff's intestate was
about 35 years of age, with good hearing and eyesight, and was
familiar with the locality and the crossing.   Both teams were walk-
ing, and traveling at the rate of about 2½ miles an hour.   As the
teams approached the crossing, the team that preceded that of the
plaintiff's intestate was from 100 to 150 feet in advance.   There was
an electric alarm bell on the far side of the crossing, and about 50
feet from the rail.   As the head team was opposite this electric bell,
it began to ring, and the horses became frightened, and so engaged
the attention of the driver that he did not notice the accident.   This
bell rang automatically when the engine passed a point 2,028 feet
from the crossing.   There was evidence that the bell had been out
of repair, but it rang on this occasion.   The highway upon which
the plaintiff's intestate was driving ran northerly and southerly
nearly parallel to the railroad track, and about 50 feet distant there-
from, until it turned sharply, with a steep incline, to pass over the
tracks at an acute angle.   The train which caused the accident was
going northerly in the same direction as plaintiff's intestate.   He was
sitting on a seat, and from the front of the head team to the seat on
which he sat was about 30 feet.   The engine struck the wheel horses
and the front of the wagon, not injuring the leaders.   The railway
tracks averaged from 6 to 12 feet higher than the highway.   There
was evidence which made it a proper question for the jury as to
whether or not the train was running at the rate of 45 or 50 miles
an hour, and too high a speed for that locality, and failed to sound
the whistle or ring the bell as it approached the crossing.   There was

¶ 3. See Railroads, vol. 41, Cent. Dig. §§ 1121, 1146.

no dispute, however, but that the headlight of the engine was burning.

The question to be determined is whether the plaintiff produced evidence which showed such proper care on the part of her intestate in approaching the track as authorize the court to submit to the jury the question of his contributory negligence. Going towards the crossing as the plaintiff's intestate was traveling, at a point 400 feet from it, the road descends sharply for about 40 feet, and continues level for about 200 feet; and at a point 150 feet from the crossing it ascends sharply until very near the crossing, when the ascent becomes more acute. In this valley, from 125 to 140 feet, the view of an approaching train is obstructed, for the reason that the bed of the highway is so low, and the bank of the railway so near and so high, that one cannot look horizontally along the track. The track comes into plain view as one approaches the crossing along this last 150 feet; and at a point from 80 to 90 feet, as stated by plaintiff's most favorable witness, the vision down the track in the direction from which the train was coming is uninterrupted for 900 to 1,000 feet. The house of Peter Young is located near the crossing, and the lot on which it is located extends from the crossing along the highway. It is this house and lot which the witnesses refer to in locating distances and points of vision from which an approaching train can be seen by one approaching the crossing along the highway. The witnesses for the plaintiff variously estimate the distance of this house from the crossing at from 100 to 125 and 150 feet. The plaintiff's own surveyor, who measured it, says that the nearest end of the Young house is 170 feet from the center of the crossing, and that the far line of his lot is 342 feet from that point. The surveyor employed by the plaintiff, in addition to making his measurements and map, was present at the taking of photographs from the highway down the track, upon which an engine was placed. He says the camera, in the taking of one photograph, was placed 40 feet from the crossing, and the engine was plainly visible 930 feet down the track, and at 81 feet it was visible 945 feet, and that all the way from the Young house to the crossing one could see a train 900 feet away, coming as the train was approaching on the evening of the accident. This witness further says that the last obstruction to the view down the track is 200 feet from the crossing. There is a slight curve about 1,000 feet from the crossing, and all of the witnesses for the plaintiff agree that from the vicinity of the Young house to the crossing an approaching train is plainly visible to that curve. They put the distances as 100 feet and 80 or 90 feet and 200 feet, but the house is the objective point, and the measured distance from the crossing was not controverted. Young's garden was on the far side of his house from the crossing, and plaintiff's witness Sutton gave testimony which tended to show that plaintiff's intestate had the possible approach of the train in mind when he was at a point opposite this garden. This point was 200 feet and more from the crossing, and, by reason of the rise of ground as one approached the crossing, the view of an approaching train became clearer. None of the witnesses for the defendant made the situation any more favorable to plaintiff's contention, but, on the

contrary, testified to facts showing that the train was even more easily observed, and could be seen at a greater distance. It therefore appears, upon the most favorable view of the testimony presented by the plaintiff, that her intestate, driving towards the crossing at a walk, had a clear and unobstructed view of the approaching train for more than 100 feet from the crossing. It is true that, in order to see the train, he must have turned and looked partially backward, for until he turned to cross the track the train was coming practically from his rear. But if he had turned, he could have seen. His team was moving slowly, and he could have stopped quickly. They were gentle, as evidenced by the fact that the head team stood just beyond the track after having been torn loose by the collision. The railway at this point was a single track, and there was no complication of a crossing with several tracks to bewilder him. The witness Sutton had spoken to him back by Young's garden, as he was walking beside the wagon, and the deceased said he thought there was no danger from a train, and looked down the track, and none was in view. To look then, and not again, and to go on from that point without observing the further precaution of watching for the approach of a train, was not the observance of that care upon his part which it was his duty to exercise. Tucker v. N. Y. C. & H. R. R. Co., 124 N. Y. 309, 26 N. E. 916, 21 Am. St. Rep. 670; Cullen v. Delaware & Hudson Canal Co., 113 N. Y. 667, 21 N. E. 716. Sutton was the only person who claimed to have seen the accident, and he did not observe the deceased as he proceeded on toward the crossing after the remark as to the train, for he turned away to the side of the highway.

The plaintiff contends that, the proof disclosing the fact that the deceased had the train in mind, the presumption must be indulged in that he continued to observe as he approached the crossing. The facts will not bear such an inference, for, if he had looked and listened, he could have both seen and heard the train, and could have stopped. The plaintiff's intestate was not confronted with the condition where it would have been unavailing for him to look and listen, and thus brought the case within the rule permitting a jury to say whether he was free from contributory negligence, as was held in Smedis v. B. & R. B. R. Co., 88 N. Y. 13. In actions of this character the plaintiff, in order to recover, must make it appear, either by direct evidence, or else by inferences fairly deducible from the facts proven, that the deceased was free from contributory negligence on his part. And when the circumstances point as much to the negligence of the deceased as to its absence, or point in neither direction, a nonsuit must be granted. Wiwirowski v. L. S. & M. S. R. Co., 124 N. Y. 425, 26 N. E. 1023; Wieland v. Delaware & Hudson Canal Co., 167 N. Y. 19, 60 N. E. 234, 82 Am. St. Rep. 707. The presumption that a person exposed to danger will exercise care and prudence in regard to his own safety does not permit the inference to be drawn that he exercised due care. Wiwirowski v. L. S. & M. S. R. Co., supra. The proof showed that the conditions were such that the deceased, by the exercise of his faculties of sight and hearing, might have averted the accident. But if the circumstances do not point

to the actual negligence of the deceased, they at least point as much to his negligence as to its absence.

Our conclusion is that there was no affirmative evidence or circumstances from which the jury could find that decedent was free from contributory negligence, and that the trial court erred in submitting to them that question, and in denying the motion for a new trial.

The judgment and order must be reversed, and a new trial granted, with costs to abide the event. All concur.